**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

IN RE:                          ) Chapter 11
                                )
WOMEN FIRST HEALTHCARE, INC.,   )
                                ) Case No. 04-11278 (MFW)
                Debtor.         )
                                )
                                )

**OPINION**[1]

Before the Court is the Motion of Sun Pharmaceuticals Industries, Ltd. ("Sun") for the allowance of an administrative claim in the amount of $295,546 for expenses incurred by it in preparing to close on the sale of an asset of Women First Healthcare, Inc. (the "Debtor") before the sale order was rescinded and a new auction ordered.  The United States Trustee (the "UST") and the ultimately successful bidder, Mutual Pharmaceutical Company, Inc. ("Mutual"), oppose the Motion.  For the reasons set forth below, the Court allows the administrative claim in part.

I.    BACKGROUND

On April 29, 2004, the Debtor filed a petition for relief under chapter 11.  During the bankruptcy case, the Debtor sought

---

[1]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

to sell its pharmaceutical and related assets.

On August 31, 2004, Sun executed an asset purchase agreement with the Debtor and became the stalking horse bidder for the Bactrim assets.  On September 2, 2004, the Debtor filed a Motion for approval of the sale of the Bactrim assets to Sun and for approval of bid procedures in connection with that sale (the "Sale Motion").  On September 8, 2004, the Court entered a Bid Procedures Order, which approved Sun as the stalking-horse bidder and allowed Sun a break-up fee of $50,000 and reimbursement of expenses up to $32,500.  Under the Bid Procedures Order, the deadline for submitting competing bids was September 16, 2004. The Debtor received no other bids by that deadline.  As a result, the Court approved the sale of the Bactrim assets to Sun for $1,750,000 on September 22, 2004 (the "Sun Sale Order").

On September 28, 2004, counsel for Mutual contacted counsel for the Debtor and stated that Mutual was interested in buying the Bactrim assets.  Counsel for the Debtor advised that the assets had already been sold to Sun and referred her to Sun's attorney.  Counsel for Mutual contacted Sun's attorney, advised that Mutual was the exclusive manufacturer of Bactrim for the Debtor, and inquired whether Sun intended to assume the Mutual manufacturing agreement.  Sun's counsel advised that it did not.

Thereafter, on October 4, 2004, Mutual filed a Motion for reconsideration of the Sun Sale Order (the "Mutual Motion").  In its motion, Mutual alleged that it had not been served with notice of the Sale Motion, although it had an interest in the Bactrim assets to be sold to Sun.  Specifically, Mutual claimed an interest in the inventory and intellectual property being sold.  On that same date, counsel for Mutual advised counsel for the Debtor that Mutual was interested in bidding on the Bactrim assets and asked what the Debtor needed from Mutual.  Counsel for the Debtor asked Mutual to provide him with a marked-up copy of the Sun asset purchase agreement and to deposit 10% of the proposed purchase price with Mutual's counsel.

After the Mutual Motion was filed, the Debtor proceeded on a parallel track:  It negotiated a carve-out from the Sun sale of any assets in which Mutual had an interest to permit that sale to go forward if the Mutual Motion was denied or if, after the auction was reopened, Sun was the ultimate winning bidder.  The Debtor also worked with Mutual to qualify it as a bidder should the Sun Sale Order be vacated.

On November 2, 2004, the Court held a hearing on Mutual's Motion.  At that hearing, the Debtor admitted that it had not served Mutual with notice of the Sale Motion or the Bid Procedures Order.  The Debtor acknowledged that Mutual was the

3

Debtor's exclusive manufacturer of Bactrim and did have an interest in the manufacturing process but asserted that the sale to Sun did not implicate that interest.  Mutual stated that it had an interest in the inventory and intellectual property to be sold and opposed the sale to Sun.  Alternatively, Mutual asserted that it was prepared to bid on the assets.  Sun opposed the Mutual Motion, arguing that it had expended considerable effort and expense in preparing for an expeditious closing on the Bactrim assets in reliance on the Sun Sale Order.  At the conclusion of the hearing, the Court found that notice of the Sale Motion and the Bid Procedures Order had not been properly given.  Consequently, the Court granted Mutual's Motion, vacated the Sun Sale Order, and set an auction of the Bactrim assets for November 10, 2004.  The Court authorized Sun to submit a claim for an administrative expense for the efforts it had expended, subject to the right of all parties to object to that claim.

On the day before the scheduled auction, at the request of the Debtor, Sun transmitted to the Debtor the detail of its claimed administrative expense, which totaled nearly $300,000 in excess of the breakup fee and expense reimbursement already authorized.

At the auction held on November 10, 2004, both Sun and Mutual participated.  Based on the original Bid Procedures Order,

4

Sun was allowed to credit bid $82,500 for its break-up fee and expenses.  To eliminate any issue regarding Sun's additional administrative claim, Mutual agreed to establish an escrow fund in the amount of $300,000 for that claim should it be the winning bidder.[2]  Ultimately, Mutual's bid of $4,282,500 plus the escrow fund was selected by the Debtor as the highest and best offer.  On November 19, 2004, the Court approved the sale of the Bactrim assets to Mutual.

On December 9, 2004, Sun filed its Motion for the allowance and payment of an administrative expense for the costs it incurred in reliance on the Sun Sale Order.  Mutual and the UST objected to Sun's motion.  Evidentiary hearings on the motion were held on April 7 and 14, 2005.  Post-trial briefing is complete and the matter is ripe for decision.


II.  JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (N) & (O).

---

[2]  While Sun was initially part of the escrow agreement negotiations, the parties were not able to agree.  Consequently, only the Debtor and Mutual signed the escrow agreement, which was attached to Mutual's asset purchase agreement.

III. <u>DISCUSSION</u>

Sun asserts that it is entitled to an administrative claim for its work in preparing to close on the purchase of the Bactrim assets from the date of the Sun Sale Order (September 22, 2004) until the new auction ordered by the Court (November 10, 2004). The UST and Mutual disagree.

A.    <u>Section 105(a)</u>

Sun argues that this Court may order the Debtor to reimburse Sun under the equitable powers conferred by section 105(a), which authorizes the Court to "issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). It asserts that the Court has broad equitable powers to do so. <u>See, e.g.</u>, <u>United States v. Energy Res. Co.</u>, 495 U.S. 545, 549 (1990) (holding that section 105(a) is "consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.").

Mutual and the UST disagree. They argue that the Court's section 105(a) powers may only be exercised within the confines of the Bankruptcy Code. <u>See, e.g.</u>, <u>In re Continental Airlines</u>, 203 F.3d 203, 211 (3d Cir. 2000) (holding that release granted to debtor's directors and officers under section 105 was not supported factually or legally); <u>In re Cajun Elec. Power Coop.</u>,

6

Inc., 185 F.3d 446, 452 n.9 (5th Cir. 1999) (finding that use of section 105(a) to enjoin state utility from considering rate decrease was abuse of discretion).  Therefore, they assert that Sun's administrative claim must be based on section 503(b) only and cannot rely on section 105(a).

The Court agrees with the UST and Mutual.  Section 105(a) "supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code.  However, section 105(a) has a limited scope.  It does not 'create substantive rights that would otherwise be unavailable under the Bankruptcy Code'." Continental Airlines, 203 F.3d at 211, quoting United States v. Pepperman, 976 F.2d 123, 131 (3d Cir. 1992).

The Third Circuit specifically cautioned, in the context of break-up fees, that the Bankruptcy Court may not "create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code."  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532 (3d Cir. 1999) (concluding that break-up fees may be awarded only if they fall within the purview of section 503(b)).

There is no independent basis under section 105(a) for the allowance of an administrative expense.  Therefore, the Court concludes that Sun must rely on other provisions of the Code for

relief.

    B.   <u>Section 503(b)(3)(D)</u>

The UST argues preemptively that Sun is also not authorized under section 503(b)(3)(D) to seek an administrative claim. Specifically, the UST notes that that section authorizes claims only of "creditors" who provide a substantial contribution to the estate which is a benefit to the estate that is not merely incidental to the creditor's actions.  <u>See, e.g.</u>, <u>Lebron v. Mechem Fin., Inc.</u>, 27 F.3d 937, 944 (3d Cir. 1994) (holding that to have a §503(b)(3)(D) claim, "the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests.").

Sun is not, however, seeking an administrative claim under section 503(b)(3)(D).  The Third Circuit has expressly recognized as an administrative claim a stalking-horse bidder's claim for a break-up fee and expense reimbursement if granting such a claim provides a benefit to the estate.  <u>See, e.g.</u>, <u>O'Brien Envtl.</u>, 181 F.3d at 535.  There is no suggestion that the predicate for such a claim is status as a creditor; nor does the benefit to the estate have to be substantial, as required by section 503(b)(3)(D).  Therefore, the Court rejects this argument of the UST.

C.   <u>Section 503(b)(1)(A)</u>

Sun asserts that it is entitled to the allowance of an administrative claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code.  Section 503(b)(1)(A) provides in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses . . . including –
>     (1)(A) the actual, necessary costs and expenses of preserving the estate. . . .

11 U.S.C. § 503(b)(1)(A).  To establish an administrative claim under this section, there must be (1) a post-petition transaction between the claimant and the estate and (2) a benefit to the estate.  <u>See, e.g.,</u> <u>O'Brien Envtl.</u>, 181 F.3d at 532-33; <u>In re Unidigital, Inc.</u>, 262 B.R. 283, 288 (Bankr. D. Del. 2001); <u>In re Mid-American Waste Sys., Inc.</u>, 228 B.R. 816, 821 (Bankr. D. Del. 1999).

The claimant bears the burden of proving its actions conferred a benefit upon the estate.  <u>See, e.g.,</u> <u>O'Brien Envtl.</u>, 181 F.3d at 533; <u>In re Transamerican Natural Gas Corp.</u>, 978 F.2d 1409, 1416 (5th Cir. 1992) ("the burden of persuasion, by a preponderance of the evidence, remains with the movant").

The parties concede that there was a post-petition transaction between Sun and the estate.  They disagree on whether Sun provided a benefit to the estate.

1.   <u>Need to Show Benefit to Estate</u>

In its motion, Sun initially claimed that it was not required to meet the burden of proving an administrative claim under section 503(b) because the funds in escrow are Mutual's. That is, if the money does not go to Sun, it will be returned to Mutual.  Thus, Sun argues, "any payment to Sun would come from Mutual and would not deplete estate assets."

This argument is without merit because, under the escrow agreement, Mutual is obligated to pay the Debtor, not Sun. Further, under that agreement no monies will be paid to the Debtor unless Sun first establishes its entitlement to an administrative claim.  Therefore, the Court concludes that Sun must prove its entitlement to an administrative claim by showing that it benefitted the estate.

2.   <u>Benefit to the Estate</u>

At trial, Sun presented evidence seeking to establish that it did confer a benefit on the estate from the time the Sun Sale Order was entered (September 22, 2004) until it was vacated (November 10, 2004).  During that time, Sun completed its due diligence and preformed other activities necessary to close on the transaction in an expeditious manner.  Doing so, it argues, provided a benefit to the estate, which was interested in closing as soon as possible because of continuing losses incurred in that

line of business.

Mutual and the UST argue that Sun is not entitled to any administrative claim because its actions were made in its own self-interest only and not to benefit the estate.  The Court rejects this argument.  "Most activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement."  Lebron, 27 F.3d at 944 (allowing administrative claim under section 503(b)(3)(D) even though claimant was acting in self-interest).  The relevant inquiry is not the motivation of the actor, but whether the estate benefitted by the actions taken.  Thus, in the event the Court finds Sun's actions benefitted the estate, the costs of those actions will be allowed despite any self-interest.

In the Sun Sale Motion, the Debtor asserted, and the Court found, that expeditious consummation of the Bactrim sale was in the best interests of the Debtor, the estate, and creditors.  The Sun Sale Order expressly stated that "(i) there is a risk of immediate and irreparable loss of value to the Acquired Assets if the Sale is not consummated, (ii) there is a substantial risk of further deterioration in the Debtor's relations with key customers, (iii) it is difficult for the Debtor in the bankruptcy environment to establish new customer relationships and maintain

normal terms with suppliers and (iv) the consummation of the transaction contemplated under the Agreement presents the best opportunity to realize the value of the Acquired Assets to avoid further decline and devaluation thereof."  (Exhibit M-22 at ¶ k.)

Further, in opposing the Mutual Motion, the Debtor argued that any delay in consummating the sale would adversely affect the estate.  Even though the Court granted the Mutual Motion, it recognized that a quick sale of the assets was critical. Therefore, the Court concludes that actions taken by Sun to close the Bactrim sale quickly did provide a benefit to the estate. The issue is, however, which specific actions taken by Sun fall into this category.

3.    Timing of Services

Mutual argues that no administrative claim should be awarded to Sun for anything done after October 5, 2004, because on that date Sun learned that Mutual was interested in acquiring the Bactrim assets.  Mutual asserts that everything done by Sun after that date was to benefit Sun alone, not the estate.  For example, Sun opposed the Debtor's suggestion that the auction be reopened. If Sun had consented, the delay inherent in hearing Mutual's Motion would have been avoided.  Ultimately, reopening the auction did benefit the estate (by increasing the price the Debtor received for the assets by more than $2.5 million).

The Court agrees, in part, with Mutual's argument. Activities undertaken by Sun to oppose the Mutual Motion or reopening the auction did not confer a benefit on the estate. Nonetheless, to the extent Sun performed activities after October 5, 2004, to prepare for a closing on the assets, a benefit was conferred on the estate.  The Debtor recognized that the Mutual Motion may not be granted and was itself working on the parallel track of closing on the sale to Sun to cover that contingency. Sun's efforts in this regard were beneficial, because as noted it was very important for the Debtor to close on the sale of the Bactrim assets as soon as possible.

    D.   Tort Claim

Sun argues, alternatively, that it is entitled to an administrative claim because its claim was caused by a post-petition tort of the Debtor.  See, e.g., Reading Co. v. Brown, 391 U.S. 471, 477 (1986) (concluding that party damaged by fire caused by trustee's negligence was entitled to administrative priority claim because of "one important, and here decisive, statutory objective: fairness to all persons having claims.").

In the present case, Sun asserts the Debtor's negligent misrepresentation as the tort necessary for its Reading claim. The Third Circuit has recognized, in dicta, that Reading continues to apply under the Bankruptcy Code.  See, e.g.,

<u>Pennsylvania Dept. of Envtl. Res. v. Tri-State Clinical Lab.</u>, 178 F.3d 685, 690-02 (3d Cir. 1999).  <u>See also</u>, <u>In re Met-L-Wood Corp.</u>, 115 B.R. 133, 135-36 (N.D. Ill. 1990) (authorizing administrative expense for party defending frivolous lawsuit by trustee "on the grounds of fundamental fairness").

Courts have applied <u>Reading</u> even where there is "no discernible benefit to the debtor estate" if "fundamental fairness" requires that the claimant's right take precedence over others.  <u>See, e.g.</u>, <u>In re Hemingway Transp., Inc.</u>, 993 F.2d 915, 929 n.17 (1st Cir. 1993) (holding that CERCLA claim of purchaser of property from debtor was entitled to administrative claim priority); <u>In re Charlesbank Laundry, Inc.</u>, 755 F.2d 200, 202 (1st Cir. 1985) (finding that fees awarded against debtor for violating zoning regulations was entitled to administrative priority under section 503(b)).

At the conclusion of the hearing on Mutual's Motion, the Court recognized that Sun had relied on the Sun Sale Order and might have incurred expenses as a result.  Fundamental fairness mandates that Sun be compensated for that.

    1.  <u>Applicability to Liquidation Case</u>

The UST argues that this Court has denied administrative expense claims based on a <u>Reading</u> tort theory where the tort was not committed during the conduct of business which benefitted the

14

estate and other creditors.  See, e.g., In re Unidigital, 262
B.R. 283 (Bankr. D. Del. 2001) (rejecting landlord's
administrative claim for damages caused by debtor's abandonment
of equipment where debtor had ceased operating at the premises
pre-petition).  This case is like Unidigital, the UST argues,
because the Debtor's alleged tortious conduct was not committed
by the Debtor in the operation of its business, but in the
liquidation of its assets.

The Unidigital case does not, however, stand for the
proposition that the debtor has to be operating for an
administrative claim to arise under Reading.  In that case, the
Court rejected the landlord's claim for administrative expense
under Reading because there was no connection between the claim
and the debtor's post-petition activities.  In this case, the
claim does arise from the Debtor's post-petition activity.
Chapter 11 cases can be liquidation as well as reorganization
cases.  So long as the activity of the Debtor was in furtherance
of its case, the Court concludes that a tort committed by it can
generate an administrative claim under Reading if fundamental
fairness requires.

2.   Tort of Negligent Misrepresentation

Sun asserts that it is entitled to an administrative expense
under Reading because the Debtor negligently misrepresented to it

(and the Court) that it had provided proper notice of the Bid

Procedures Order and the Sale Motion.  Under Delaware law, the

tort of negligent misrepresentation is established when:

> (1) One who, in the course of his business, profession
> or employment, or in any other transaction in which he
> has a pecuniary interest, supplies false information
> for the guidance of others in their business
> transactions, is subject to liability for pecuniary
> loss caused to them by their justifiable reliance upon
> the information, if he fails to exercise reasonable
> care or competence in obtaining or communicating the
> information.

Restatement (Second) of Torts § 552 (1977).  See also, Brug v.

Enstar Group, Inc., 755 F.Supp. 1247, 1258-59 (D. Del. 1991);

Carello v. PricewaterhouseCoopers LLP,  2002 WL 1454111 (Del.

Super. July 3, 2002).

The UST and Mutual argue that Sun asks this Court to extend

Reading unreasonably to include situations where a debtor makes

an innocent mistake while performing its duties.  They argue that

Reading and its progeny include only egregious conduct.  See,

e.g., Reading, 391 U.S. at 478-79 (negligently causing a fire);

Yorke v. N.L.R.B., 709 F.2d 1138, 1143 (7th Cir. 1983) (violating

federal labor laws);  Met-L-Wood Corp., 115 B.R. at 135-36

(prosecuting frivolous litigation).  They contend that in this

case the Debtor did not engage in any wrongful or illegal

conduct, it simply made an honest mistake.

The UST notes that, although Mutual had earlier expressed interest in buying the Bactrim assets, when asked post-petition if it were still interested, it said no.  Further, the UST argues that the Debtor was correct in believing that it had no need to notice Mutual with the Sale Motion since Sun was not assuming Mutual's contract.

The Court disagrees.  As a creditor, Mutual was entitled to notice of the sale of a substantial asset of the Debtor.  Further, as the exclusive manufacturer of Bactrim, Mutual had an interest in the manufacturing process (and arguably in the inventory on hand) which could be implicated by the sale.  Although Mutual's supply contract and intellectual property were ultimately removed from Sun's asset purchase agreement, it was not until after Mutual filed its motion that this was clarified.  That is precisely why notice should have been given to it in the first place; to permit it to protect its interests.

While conceding that the Debtor did represent that it had properly noticed the sale, the UST and Mutual assert that any reliance on that representation ceased being reasonable on October 4, 2004, when the Mutual Motion was filed and Sun learned that notice had not, in fact, been given to Mutual.

Sun argues nonetheless that Mutual's motion did not apprise it of the fact that Mutual intended to bid on the Bactrim assets.

That Motion asserted only that Mutual had an interest in the assets, which therefore could not be sold to Sun.  In fact, Sun's vice president in charge of acquiring assets from the Debtor, Kirti Ganorkar, testified that Saundra Pelletier, a former vice president of the Debtor, told him that Mutual had no interest in buying the Bactrim assets.  Therefore, Sun asserts that it was reasonable for it to continue to prepare for closing on its sale until the new auction was held on November 10, 2004.

The UST and Mutual argue that there is no basis for Sun's assertion that it reasonably relied on the Debtor's misrepresentations.  At trial, Ms. Pelletier testified that she merely told Mr. Ganorkar that Mutual had not told her it was interested in purchasing the Bactrim assets when she had advised it the assets were for sale.  She denied stating that Mutual affirmatively told her it was not interested in buying those assets.

The Court agrees that the testimony regarding Ms. Pelletier's statements to Mr. Ganorkar does not establish reasonable reliance.  At the time the statements were made, Ms. Pelletier was no longer employed by the Debtor and, therefore, was unable to make any representations to Sun on behalf of the Debtor.

18

Further, even if Ms. Pelletier had made the statements Sun asserts she did, those representations directly contradict the statements made by counsel for the Debtor to Sun's counsel. Counsel for the Debtor testified that on October 5, 2004, he advised counsel for Sun that Mutual was interested in submitting a bid. E-mails from that time period evidence that Sun's counsel was aware of Mutual's interest and intended to discuss the same with his client. (See Exhibits M-4, M-11, M-13.) On cross-examination, counsel for Sun had to admit that his detailed bills reflect conversations he had with counsel for the Debtor regarding Mutual's interest in bidding and the Debtor's interest in reopening the auction.

Although Sun continued to assert at the hearing and in its post-trial briefs that it did not know of Mutual's interest in bidding until Mutual advised the Court of this fact at the October 28, 2004, hearing, this is simply not credible given the overwhelming evidence to the contrary. Therefore, the Court concludes that Sun did know on October 5, 2004, that Mutual was interested in bidding on the Bactrim assets and that the Debtor was interested in reopening the auction. Consequently, after that date Sun could not have reasonably relied on the Debtor's representations that proper notice was given and the Sale Order was valid.

E.   Application of Law to the Facts

Based on the above principles, the Court concludes that Sun has an administrative claim under Reading for all its expenses incurred from September 22 through October 4, 2004.  Sun also has an administrative claim under section 503(b)(1)(A) for expenses incurred after that date but only to the extent it has established that its specific activities conferred a benefit on the estate.  The Court thus considers the work actually done by Sun in the relevant time periods, by category, to determine if it can be allowed as an administrative expense.

1.   Reformulation Study

Sun claims $131,900 for a reformulation study to determine whether Sun could manufacture Bactrim in a "once-a-day" dosage rather than the Debtor's "twice-a-day" dosage.  The Method Validation Report dated September 30, 2004, and the Research Study Protocol dated October 1, 2004, were completed before October 4, 2004.  According to Mr. Ganorkar's testimony, however, the actual study was not begun until October 5, 2004, and was not completed until October 20, 2004.  The final report was not finished until the following year.

Because they were done before October 5, 2004, Sun is entitled to an administrative expense for the cost of the Method Validation Report and the Research Study Protocol.  Sun presented

evidence that the respective costs of those reports was $47,422 and $21,222. Mutual contested the reasonableness of the costs of the reformulation study. Mutual's witness testified that the cost of the study should have been significantly less (roughly one-third) because it was done in India rather than the United States and was done by a subsidiary of Sun rather than an independent third party. Mr. Ganorkar acknowledged that studies performed in India cost one-third of those conducted in the United States, Canada or Europe. Therefore, he stated that this study would have cost in excess of $300,000 in those countries. Mutual's witness disagreed and put the cost of a comparable study in the United States at $120,000 to $150,000 concluding that it should have cost only $40,000 to $50,000 in India.

The Court agrees with Mutual that the cost is not reasonable. Since the study was done by a wholly owned subsidiary of Sun, the Court cannot conclude that the cost is market-driven. Further, the Court is not convinced that the invoices even represent the cost of the study. Mr. Ganorkar testified that Sun had not paid those invoices because Sun only pays its subsidiary on an annual basis for all the bio-studies it performs. In addition, the reformulation study was not complex. It involved a drug which had been in use for years and whose properties were well-known. The bio-study involved only 20

21

subjects who were given a single dose and then had blood work done to see the amount of the drug remaining after 24 hours. The study was repeated one week later. The Court, therefore, accepts the testimony of Mutual's witness as the best evidence presented of the market price for such a study and will allow Sun one-third of the cost of the first two parts of the reformulation study or $22,881.33.

With respect to the actual bio-study which was conducted after October 4, 2004, the Court concludes that it provided no benefit to the estate. There was no evidence that Sun considered it necessary to complete the study before it closed on the sale. Mr. Ganorkar testified that he told the Sun employee in charge of the study not to start until the Sun Sale Order was entered because Sun wanted to be sure it would own the asset. Sun did not seek to delay the closing until the bio-study was completed. In fact, Sun's counsel stated that he asked the Debtor to close on the assets early in October, before the study was done.[3] As a result, the Court cannot conclude that the bio-study was necessary for closing.

---

[3] This is disputed by the Debtor's counsel, however, who testified that Sun never asked for the Debtor to close on the Bactrim assets until the eve of the first hearing on Mutual's Motion. (See also Exhibit S-45.) The Court finds it unnecessary to decide this issue.

Nor is there any evidence that the bio-study provided any other benefit to the estate. The study was an internal study performed for Sun. It was not shared with the Debtor. The Debtor's estate is unaffected by the exact formulation or dosage used to manufacture Bactrim. Therefore, the Court concludes that the bio-study conducted by Sun provided no value to the Debtor's estate and will not be allowed as an administrative expense.

Similarly, the cost of Dr. Khanna ($15,900) in consulting with Sun on the bio-study is not allowable. Dr. Khanna did not go to India to perform his services until the last week in October, 2004. Therefore, his work did not provide any benefit to the estate.

Consequently, the Court will allow Sun only $22,881.33 as an administrative claim for the work done on the reformulation study before October 5, 2004.

### 2.    Internal Time and Expenses

Sun's administrative claim also seeks $75,834 for time spent by its management and employees. The cost was calculated by taking the employees' annual salary and overhead and dividing it by the total number of hours worked per year (1600). That hourly rate was then multiplied by an estimate of the time that employee said he spent on the Bactrim sale. For Sun's CEO, Mr. Shanghvi, the result was over $5,000 per hour so Sun reduced it to $900.

Exhibit S-51 summarizes those costs.

Sun seeks $43,200 for Mr. Shanghvi's time and expenses and $4,080 for Mr. Ganorkar's time and expenses.  Mr. Ganorkar testified that he was in charge of the Bactrim purchase and that Mr. Shanghvi, as CEO of Sun, was consulted on important aspects of the purchase.

The bulk of the charges for Mr. Shanghvi and Mr. Ganorkar are the expenses of the trip they took to the United States to meet with distributors and suppliers of Bactrim.  In general, the Court concludes that these expenses would be compensable because they were efforts taken by Sun in preparation for closing on the Bactrim assets.  Further, Sun's efforts assured customers and suppliers that someone was interested in buying those assets, thereby preserving their value.

The Court cannot, however, find that all of the expenses for that trip are allowable as an administrative claim.   Ms. Pelletier was one of the people with whom Mr. Shanghvi and Mr. Ganorkar met, and she testified that the bulk of the meeting concerned the other two drug assets which Sun had purchased from the Debtor (Midrin and Ortho-Est) because of the uncertainty caused by the Mutual Motion.  As a result, the Court is inclined to reduce the expenses for the U.S. trip by two-thirds, because Sun's efforts to sell its other products provided no benefit to

the estate.

Mr. Shanghvi and Mr. Ganorkar estimated that they spent 44 hours each on the trip, for a total cost of $42,240.  They have charged only half, $21,120.  The Court will allow only one-third of that time, $14,080.

Sun seeks airfare of $8,503.98.[4]  (Exhibits S-16 & S-17.) It appears, however, that Mr. Shanghvi's airfare is for business or first class.  Airfare for both at the coach rate would be $5,548.76.  Sun also seeks $1,745.06 in hotel expenses.[5] Finally, Sun seeks reimbursement for mobile phone roaming charges for all calls made by Mr. Shanghvi and Mr. Ganorkar while they were in the United States.  These charges are $486.83.  (Exhibits S-22 & S-23.)  The above travel expenses total $7,780.65.  One-third ($2,593.55) will be allowed.

The remainder of the time for Mr. Shanghvi and Mr. Ganorkar is for time spent in India.  There is, however, no detail of what work was done during that time.  It is admitted that both spent time dealing with the Mutual Motion and Sun's response to it,

---

[4]  Many of the expenses are reflected in rupees.  The Court has used a conversion rate of 45, which is what Mr. Ganorkar used in his testimony.

[5]  Though the hotel charges were $1,046.48 and $692.58 (Exhibits S-19 & S-20), the credit card charges were $1,049.48 and $695.58. (Exhibit S-18.)  The Court will allow the larger amount since that is what Sun had to pay.

which would not be allowable as an administrative expense.  The
Court, on this record, is unable to determine what was done that
benefitted the estate.  Because the burden of proof is on Sun,
the Court will disallow the rest of the request for reimbursement
for the time of Mr. Shanghvi and Mr. Ganorkar.  <u>See, e.g.</u>,
<u>O'Brien Envtl.</u>, 181 F.3d at 533 (burden of proof is on the
claimant); <u>Transamerican Natural Gas</u>, 978 F.2d at 1416 (same).

Sun also seeks $8,400 for Mr. Valia's time and expenses.
Mr. Ganorkar testified that Mr. Valia is in charge of all legal
and financial matters.  Specifically, he testified that Mr. Valia
was involved in the transfer of funds to pay for the Bactrim
assets and the preparation of legal documents necessary for the
closing.  Sun did not provide any breakdown for when the services
were provided by Mr. Valia.  Nonetheless, the Court concludes
that these expenses are allowable as part of Sun's administrative
expense because all this work related to an expeditious closing
on the Bactrim assets and, therefore, benefitted the estate.

Sun seeks $1,250 for the costs for Dr. Nitin Dharmadhikari's
efforts on the reformulation study.  Because the Court concluded
that the cost of that study done before October 5, 2004, is
allowable, part of Dr. Dharmadhikari's time should be
compensable.  However, no breakdown was provided as to what part
of his time was involved prior to October 5, 2004.  Therefore,

the Court will not allow any of this cost.  Id.

Mr. Ashok Bhuta is Sun's in-house counsel.  Mr. Ganorkar testified that Mr. Bhuta did drafting and other work on the asset purchase agreement, the board resolutions to approve the sale, the trademark issues, and the carve-out of the Mutual assets. All of this work did benefit the estate as it would have allowed Sun to close on the assets.  The costs of the time of Mr. Bhuta ($1,080) will be allowed.

In this category, Sun also seeks reimbursement for the time of employees of Caraco (totaling $16,610).  Sun asserts Caraco is its arm in the United States.  Caraco is, however, a separate corporation and Sun only owns 62% of it.  Mr. Ganorkar admitted that Caraco did not and would not bill Sun for any expenses of its employees on the Bactrim project.  Therefore, the Court finds that these are not allowable expenses of Sun.

### 3.   Attorneys' Fees and Expenses

Sun asserts an administrative claim for $50,924 in fees for its counsel in the United States and $4,680 for its counsel in India.  The Court will disallow both these charges because Sun has not met its burden of establishing which of those charges occurred before October 5, 2004, and which benefitted the estate. Id.  Although Sun's U.S. counsel did provide Sun with a detailed

bill of services rendered, it was never moved into evidence.[6]
Therefore, the Court is unable to allow any of those expenses as
part of Sun's administrative claim.

The bill presented by Sun's Indian counsel provided no
detail of the services rendered.  (Exhibit S-33.)  Mr. Ganorkar
testified that the activities of Mr. Bathiya in October, 2004,
were to review the Mutual Motion and advise on what Sun's
response should be.  These activities were of no benefit to the
estate.  Therefore, they will not be allowed as part of Sun's
administrative claim.

4.   Currency Conversion

Sun also seeks allowance of an administrative claim for
reimbursement of currency conversion losses in the amount of
$26,800.  Sun asserts it is entitled to this because the value of
the rupee dropped between September 2, 2004, when it gave the
Debtor a deposit and December 6, 2004, when the Debtor returned
its deposit.  Sun also seeks compensation for the loss in value
of the rupee between October 5, 2004, when it sent the balance of
the purchase price to the Debtor and October 15, 2004, when it
received those funds back.

---

[6]   The bill was used effectively by Mutual in its cross-
examination of counsel for Sun to establish that Sun did, in
fact, have notice of Mutual's desire to bid on the Bactrim
assets.

The Court concludes that this is not allowable.  The Debtor solicited bids for its assets in U.S. currency.  The cost of converting Sun's funds into U.S. currency should therefore not be borne by the estate.  In addition, the Bid Procedures Order required that, in the event Sun was outbid, Sun would remain as a back-up bidder until fifteen business days after the sale order became final.  (See Bid Procedures Order at ¶ 12.)  Thus, it was appropriate for the Debtor to retain the deposit.

Further, it is not clear that the loss in value of Sun's remaining purchase price was the result of any misrepresentation by the Debtor.  Sun transferred the funds to the Debtor on October 5, 2004, after Mutual had filed its motion.  The funds were returned to Sun's counsel on October 7, 2004, at its request.  Any delay between October 7 and October 15 when counsel for Sun returned the funds to Sun was not caused by the Debtor. No evidence was presented of any reduction in value of the rupee between October 5 and 7, 2004.  Instead, Sun offered evidence of the difference in value between October 5 and October 15, 2004. (Exhibit S-13.)[7]  Even that evidence was contradicted by Exhibit S-12 which showed the same exchange rate on both dates.  Mr.

---

[7]  Mutual objected to the admissibility of Exhibit S-13 as a business record because it was prepared in anticipation of litigation.  See F.R.E. 803(6).  Because the Court does not allow any of the costs which rely on Exhibit S-13, it is not necessary to rule on this objection.

Ganorkar admitted that the exchange rate depended on the bank and that it used numerous banks.  Therefore, none of the costs related to the currency conversion will be allowed.


IV.  <u>CONCLUSION</u>

Based upon the foregoing, and due to the unique circumstances warranting the reconsideration of the Sun Sale Order, the Court concludes that Sun is entitled to an administrative claim for expenses in the amount of $49,034.88 in addition to the break-up fee and expenses previously approved.

An appropriate Order is attached.


                              BY THE COURT:


Dated: October 21, 2005       _____
                              Mary F. Walrath
                              United States Bankruptcy Judge